UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-CIV-23720-SCOLA
            (11-CR-20587-SCOLA)
MAGISTRATE JUDGE P.A. WHITE

SANDRA HUARTE,                   :

        Movant,                  :

v.                               :          REPORT OF
                                        MAGISTRATE JUDGE
UNITED STATES OF AMERICA, :

        Respondent.              :
_____

Introduction

    This matter is before this Court on the movant's motion to
vacate pursuant to 28 U.S.C. §2255, attacking her sentence entered
after a jury trial resulted in her convictions for conspiracy to
commit health care fraud, substantive health care fraud,
conspiracy to receive pay and healthcare kickbacks, conspiracy to
commit money laundering, and money laundering (2 Counts) in case
no. 11-20587-CR-SCOLA.

    The Court has reviewed the movant's motion (Cv-DE#1), the
government's response with multiple exhibits (Cv-DE# 13), the reply
(DE#21), the Presentence Investigation Report (PSI), and all
pertinent portions of the underlying criminal file.

    Construing the movant's claims liberally as afforded *pro se*
litigants, pursuant to Haines v. Kerner, 404 U.S. 419 (1972), the
movant appears to raise the following claims:

    1.    Counsel misapprehended the governing law and how it
          applied to the evidence, resulting in a futile

defense strategy.

2.  The government violated due process of law and its
    duty to ensure a fair trial when it engaged in
    pretrial discovery tactics designed to
    surreptitiously discovery the defense strategy.

3.  The government knowingly presented unreliable and
    false testimony in violation of due process.

4.  Federal fraud statutes are unconstitutionally vague
    and as applied constitute a bill of attainder or an
    *ex post facto* law.

5.  Counsel provided inadequate assistance during the
    plea bargaining negotiations.

6.  Counsel was ineffective for failing to object to
    the jury instructions as such the instructions were
    only reviewable for plain error on appeal.

## Procedural History

The procedural history of the underlying criminal case reveals
that the movant was charged by superseding indictment with
conspiracy to commit health care fraud and 12 counts of substantive
health care fraud, one count of conspiracy to pay kickbacks,
conspiracy to commit money laundering and 4 counts of money
laundering. (DR-DE# 611). There were an additional eight defendants
charged in the health care fraud scheme.

The charges arose from a scheme to defraud medicaid through
Biscayne Milieu Health Center. The scheme has been summarized by
the Eleventh Circuit's opinion affirming the movant's conviction.
The summarized the facts as follow:

In 1996, Biscayne Milieu Health Center, Inc. ("Biscayne
Milieu"), located in North Miami, was incorporated in
Florida. It offered a partial hospitalization program
("PHP") for patients with mental illness. In 1997,

2

Biscayne Milieu was certified as a Community Mental Health Center; it received a provider number allowing it to bill Medicare for PHP treatment. A PHP provides intensive outpatient treatment for patients with acute mental illness who are sufficiently ill that they would otherwise require inpatient hospitalization. Medicare covers partial hospitalization programs providing treatment for mental illness, but only does so subject to a variety of conditions.

These Medicare rules and regulations are set forth in the Local Coverage Determination ("LCD"). Medicare requires that, to qualify for the PHP benefit, the services must be reasonable and necessary for the diagnosis and active treatment of the patient's condition. The LCD makes clear that PHPs are structured to "provide patients with profound or disabling mental health conditions an individualized, coordinated, intensive, comprehensive, and multidisciplinary treatment program not provided in a regular outpatient setting." A given patient must be experiencing "an acute onset or decompensation of a covered Axis I mental disorder," severe enough to prevent the patient from functioning in normal daily activities outside of a hospital setting.1 And there must also *951 be a reasonable expectation that active treatment in the PHP will improve the patient's condition. Patients should not remain in PHPs indefinitely.

Further, dual diagnosis patients are those suffering from both substance abuse and acute mental disorders. Under Medicare's regulations, dual diagnosis patients may be eligible for PHP treatment. But PHP treatment is not authorized for "individuals with persistent substance abuse" who "cannot or refuse to participate with active treatment of their mental disorder." An addicted individual may be admitted as long as the individual is not actively using the substance at the time of admission and has an acute mental health crisis.

For a patient to be admitted to a PHP, a "psychiatrist or physician trained in the diagnosis and treatment of psychiatric illness" must certify that the patient would require in-patient psychiatric hospitalization if the PHP services were not provided, and must attest that the services will be furnished while the patient is under the care of a physician and pursuant to an individualized plan of care. Once a patient is enrolled in a PHP,

3

Medicare requires documentation supporting the medical
necessity of the claims made by the PHP provider. This
documentation includes progress notes detailing the
patient's participation in and response to the intensive
treatment.

Partial hospitalization in a PHP is a very intensive and
expensive form of treatment for patients experiencing an
acute mental health crisis. The evidence showed that
Biscayne Milieu was paid $165 per patient per day for
outpatient treatment or approximately $5000 per month per
patient.

The owners and operators of Biscayne Milieu—the
appellants here—agreed to be bound by these rules and
regulations and to refrain from filing false claims.
Because of the volume of claims processed by Medicare,
the candor and truthfulness of the appellants, as health
care providers making claims into the system, are
absolute necessities.

As is too often the case, the appellants here concocted
and engaged in a pernicious scheme to defraud Medicare
and preyed upon vulnerable victims. To carry out the
scheme, the owners and operators of Biscayne Milieu: (a)
submitted false and fraudulent claims to Medicare for PHP
services for patients who were not eligible for PHP
treatment, for PHP services that were not medically
necessary, for PHP services that were not eligible for
Medicare reimbursement, and for PHP services that were
not actually provided by Biscayne Milieu; (b) offered,
paid, or received kickbacks and bribes for recruiting
Medicare beneficiaries to attend Biscayne Milieu; (c)
paid kickbacks and bribes to patients to ensure the
attendance of ineligible Medicare beneficiaries at
Biscayne Milieu; (d) concealed the submission of false
and fraudulent claims to Medicare, the receipt and
transfer of the proceeds from the fraud, and the payment
of kickbacks and bribes to patient recruiters and
Medicare beneficiaries; and (e) diverted proceeds of the
fraud for personal use.

Further, Biscayne Milieu employees and agents, including
a doctor, therapists, nurses, and social workers,
implemented the fraud by admitting ineligible patients to
Biscayne Milieu, holding therapy sessions for patients
who did not qualify for PHP treatment, falsifying group

4

therapy notes to justify fraudulent claims to Medicare, and recruiting Haitian patients who did not qualify for PHP treatment by promising to assist such patients with applications for United States citizenship. At trial, numerous former employees of Biscayne Milieu, many of whom were separately indicted and had previously pled guilty to their participation in the fraud scheme, offered substantial evidence of the scheme's scope and design.

From 2007 to 2011, Biscayne Milieu submitted $57,689,700 in Medicare claims for PHP care of mentally ill patients, and Medicare paid $11,481,593 on those claims. This billing was largely fraudulent for the simplest of reasons. Virtually all of the patients treated at Biscayne Milieu's PHP were not suffering an acute onset of a covered Axis I mental disorder; did not have a reasonable expectation of improvement as a result of PHP treatment; or were not cognitively able to participate in PHP treatment. As the district court found, even the few patients who might have had such an acute mental disorder did not receive the medical care that was required under the PHP rules.

Rather than eligible PHP patients, the patient population principally fell into four categories: (1) chronic substance abusers; (2) elderly patients with dementia; (3) Haitian patients seeking immigration benefits; and (4) paid patients. Chronic substance abusers constituted an enormous percentage of the patient population at Biscayne Milieu. Trial witnesses testified that between 70 percent and 96 percent of Biscayne Milieu patients were chronic substance abusers. By virtue of their chronic substance abuse and lack of an acute mental disorder, the patients at Biscayne Milieu were, for the most part, not eligible for PHP treatment at all. Even though it was regularly admitting substance abusers, Biscayne Milieu also failed to provide meaningful treatment for substance abuse. In short, during the relevant period, Biscayne Milieu operated a patient mill supported by a kickback scheme that ensured an ongoing supply of patients.

The kickback scheme itself was highlighted by the use of what the parties often referred to as the "money sheet." The money sheet included columns for: the patient's name; the physician responsible for admitting the patient into

the PHP; the initials of the person who referred the patient; and a box for each day of the month. Biscayne Milieu billed Medicare, and paid the recruiter, for each day that had an "X" in the box, which showed that the patient attended therapy that day. Recruiters were paid only for days the patient attended therapy, and they were not paid for any days that the patient was absent.

United States v. Moran, 778 F.3d 942, 950–52 (11th Cir. 2015).The movant's role in the scheme is summarized in the Eleventh Circuit's opinion affirming her conviction and sentence as follows:

> Defendant Antonio Macli's daughter, defendant **Sandra Huarte**, was in charge of Biscayne Milieu's Medicare billing and Biscayne Milieu's payroll. In this capacity, defendant **Huarte** oversaw and administered Biscayne Milieu's payment of illegal kickbacks to patient recruiters. Defendant **Huarte** also had the "money sheets" in her office, which she used to calculate the recruiter kickbacks. Further, recruiter James Edwards testified to defendant **Huarte**'s possession of the "money sheets." In addition, defendant **Huarte** instructed patient recruiters to recruit Haitian patients to attend the PHP who were not mentally ill and were not qualified for PHP treatment. Defendant **Huarte** also paid therapists to falsify group therapy notes and was aware of numerous other fraudulent practices at Biscayne Milieu. Therapist Manotte Bazile testified that defendant **Huarte**, on more than one occasion, requested that Bazile fill out falsified group notes and then paid Bazile, by hand-delivered check, in excess of her salary, when the notes were completed.
>
> Defendant **Huarte** also served as CEO of North Biscayne Investment, Inc., a separate vehicle for transferring the proceeds of the health care fraud to defendants Antonio Macli and **Huarte**. Several North Biscayne Investment bank accounts were involved in the transfer of fraudulent Medicare proceeds. Defendant **Huarte** used the bank accounts to transfer fraudulent Medicare proceeds to herself and others.

Id. at 954 (emphasis added).

The trial lasted from July 9, 2012 until August 23, 2012. At the close of the government's case the court granted judgment of acquittal on eight of the substantive counts as to all defendants. The defendant was found guilty of conspiracy to commit health care fraud, substantive counts of health care fraud, conspiracy to receive pay and healthcare kickbacks, conspiracy to commit money laundering, and money laundering (2 Counts). (CR-DE# 1327). The movant's post trial motion for judgment of acquittal or new trial was denied. (CR-DE# 1025).

The movant was sentenced to 262 months imprisonment. (CR-DE# 1327). The term consisted of concurrent 22 month sentences for all but the conspiracy to commit money laundering charge and a consecutive 240 month sentence for the money laundering charge.

The petitioner, along with her eight co-defendants, appealed. On appeal the movant raised the following claims:

1. Whether sufficient evidence supports the movant's convictions. Moran at 960-962.

2. Whether the conspiracy to commit health care fraud and conspiracy to receive and pay health care kickbacks are multiplicitous. Id. at 963-964.

3. The district court abused its discretion by admitting the lay opinion of various witnesses who testified as to the eligibility of patients to receive treatment as well as, in the view of the [movant], these patients' medical diagnoses." Id. at 966-967.

4. The district court clearly erred in determining the movant was responsible for a loss amount of between $7 million and $20 million, which resulted in 20 level increase in her offense level. Id. at 973-975.

5. The district court erred by imposing the a two level increase for mass marketing. Id. at 975-977.

6. The district court erred in applying the

sophisticated means enhancement where her individual action in the health care fraud were not sophisticated. <u>Id.</u> at 977.

7. The district court erred by applying the two level increase because the offense involved the conscious or reckless risk of death or serious injury. <u>Id.</u> at 977-978.

8. The district court erred by applying the two level increase for targeting vulnerable victims. <u>Id.</u> at 978.

The movant's convictions and sentence were affirmed on February 17, 2015. (Cv-DE# 1450). The Supreme Court denied the movant's petition for writ of certiorari. (CR-DE# 1468).

## Discussion of Claims

As will be demonstrated in more detail *infra*, the movant is not entitled to vacatur on any of the claims presented. When viewing the evidence in this case in its entirety, the alleged errors raised in this collateral proceeding, neither individually nor cumulatively, infused the proceedings with unfairness as to deny the petitioner due process of law. The petitioner therefore is not entitled to habeas corpus relief. <u>See</u> <u>Fuller v. Roe</u>, 182 F.3d 699, 704 (9 Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation), <u>overruled on other grounds</u>, <u>Slack v. McDaniel</u>, 529 U.S. 473, 482 (2000). <u>See also</u> <u>United States v. Rivera</u>, 900 F.2d 1462, 1470 (10 Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the petitioner's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. <u>See</u> <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 369-70 (1993).

Here, the movant challenges counsel's effectiveness for multiple reasons.  To establish deficient performance, the movant must show that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence. Strickland, supra. See also Cummings v. Sec'y for Dep't of Corr's, 588 F.3d 1331, 1356 (11th Cir. 2009)("To establish deficient performance, a defendant must show that his counsel's representation fell below an objective standard of reasonableness in light of prevailing professional norms at the time the representation took place.")(internal quotation marks omitted). The Court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000)(en banc), cert. den'd, 531 U.S. 1204 (2001)(quoting Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)). There are no absolute rules dictating what is reasonable performance because absolute rules would restrict the wide latitude counsel have in making tactical decisions. Id. at 1317. The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Chandler, 218 F.3d at 1313. Instead the test is whether what counsel did was within the wide range of reasonable professional assistance. Id. at 1313 n.12.

Regarding the prejudice component, the Supreme Court has explained "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In assessing whether a particular counsel's performance was constitutionally deficient, courts indulge a strong presumption that counsel's conduct falls within the wide range of

reasonable assistance. Strickland, 466 U.S. at 689. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. A court need not address both prongs of Strickland if the defendant makes an insufficient showing on one of the prongs. Strickland, 466 U.S. at 697. See also Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004).

A court must adhere to a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Id. at 690-91. To uphold a lawyer's strategy, the Court need not attempt to divine the lawyer's mental processes underlying the strategy. "There are countless ways to provide effective assistance in any given case." Strickland, 466 U.S. at 689. No lawyer can be expected to have considered all of the ways. Chandler, 218 F.3d at 1316.

Since the sentence ultimately imposed upon the defendant is a "result of the proceeding," in order for a petitioner to satisfy the prejudice-prong of Strickland, he must demonstrate that there is a reasonable probability that his sentence would have been different but for his trial counsel's errors. See United States v. Boone, 62 F.3d 323, 327 (10th Cir.)(rejecting the defendant's claim that counsel was ineffective in part because the defendant failed to show "that the resulting sentence would have been different than that imposed under the Sentencing Guidelines"), cert. denied, 516 U.S. 1014 (1995). Thus, the Strickland test applies to claims involving ineffective assistance of counsel during the punishment phase of a non-capital case. See Glover v. United States, 531 U.S. 198 (2001)(holding "that if an increased prison term did flow from an error [of counsel] the petitioner has established Strickland

prejudice"); <u>Spriggs v. Collins</u>, 993 F.2d 85, 88 (5th Cir. 1993).
If the petitioner cannot meet one of <u>Strickland</u>'s prongs, the court
does not need to address the other prong. <u>Strickland</u>, 466 U.S. at
687, 104 S.Ct. at 2064. <u>See also</u> <u>Butcher v. United States</u>, 368 F.3d
1290, 1293 (11th Cir. 2004).

Furthermore, a §2255 movant must provide factual support for
his contentions regarding counsel's performance. <u>Smith v. White</u>,
815 F.2d 1401, 1406-07 (11th Cir.1987). Bare, conclusory allegations
of ineffective assistance are insufficient to satisfy the
<u>Strickland</u> test. <u>See</u> <u>Boyd v. Comm'r, Ala. Dep't of Corr's</u>, 697 F.3d
1320, 1333-34 (11th Cir. 2012); <u>Garcia v. United States</u>, 456
Fed.Appx. 804, 807 (11th Cir. 2012) (<u>citing</u> <u>Yeck v. Goodwin</u>, 985
F.2d 538, 542 (11th Cir. 1993)); <u>Wilson v. United States</u>, 962 F.2d
996, 998 (11th Cir. 1992); <u>Tejada v. Dugger</u>, 941 F.2d 1551, 1559
(11th Cir. 1991); <u>Stano v. Dugger</u>, 901 F.2d 898, 899 (11th Cir.
1990)(<u>citing</u> <u>Blackledge v. Allison</u>, 431 U.S. 63, 74, 97 S.Ct. 1621,
52 L.Ed.2d 136 (1977)); <u>United States v. Ross</u>, 147 F. App'x 936,
939 (11th Cir. 2005).

Finally, the Eleventh Circuit has recognized that the test is
not what the best lawyers would have done or even what most good
lawyers would have done, but rather whether some reasonable lawyer
could have acted in the circumstances as defense counsel acted.
<u>Williamson v. Moore</u>, 221 F.3d 1177, 1180 (11th Cir. 2000). "Even if
counsel's decision appears to have been unwise in retrospect, the
decision will be held to have been ineffective assistance only if
it was 'so patently unreasonable that no competent attorney would
have chosen it.'" <u>Dingle</u>, 480 F.3d at 1099 (<u>quoting</u> <u>Adams v.
Wainwright</u>, 709 F.2d 1443, 1445 (11th Cir. 1983)). The Sixth Circuit
has framed the question as not whether counsel was inadequate, but
rather counsel's performance was so manifestly ineffective that

"defeat was snatched from the hands of probable victory." <u>United States v. Morrow</u>, 977 F.2d 222, 229 (6th Cir. 1992).

<u>Misapprehension of the Law</u>

In her first claim the movant contends that counsel misapprehended the law and how it applied to the evidence. As a result, trial counsel's strategy was futile. The movant argues that counsel should have pursued a defense that she sincerely, if mistakenly, believed her conduct was legal. In support of this defense counsel should have presented evidence that the practices that were allegedly fraudulent were actually sound business practices in any environment other than highly regulated industries like government subsidized health care.

The movant has adopted the reply of her brother, Jorge Macli, as filed in case number 16-23421-CV-SCOLA DE#20. In that reply it is argued that counsel did not consider or explain <u>Bradley v. United States</u>, 644 F.3d 1213 (11th Cir. 2011). The movant provides little in the way of explanation of how <u>Bradley</u> applies to the instant case, however it appears that she is arguing that the method of compensating patient recruiters has been found to be illegal. A reading of <u>Bradley</u> does not reveal any such finding.

The gist of the movant's argument is that she mistakenly believed her conduct was legal. She argues that counsel should have presented evidence of "modern business practices tying personal compensation to economic performance." She believes that if such evidence had been presented it would have created a doubt as to her intent because the practices that were fraudulent were actually sound business practices in "any environment other that the highly regulated industries like government subsidized health care."

12

The flaw in the movant's argument is that counsel did pursue a good faith defense along with a defense that the had no knowledge or did not participate in the fraud. Counsel also argued that the voluminous and confusing Medicare rules led to innocent mistakes which they were unaware violated the Medicare rules. Counsel conceded that some mistakes in billing may have been made, but argued that this was a violation of the rules of Medicare, not proof of a conspiracy to defraud. Counsel argued that the Biscayne Millieu was a legitimate PHP that provided services to qualified individuals.

The jury was instructed that good faith is a complete defense to the health care fraud charges. As part of that instruction the jury was advised that the movant did not need to prove good faith, because the government was required to establish that she acted with specific intent to defraud. This instruction complemented counsel's arguments to the jury. However, despite counsel's best efforts, the jury ultimately rejected these arguments. Counsel pursuit of a good faith defense was not based on a misapprehension of the law and does not constitute deficient performance.

The petitioner's argument that counsel should have presented evidence that it was a proper business practice to tie compensation to performance is apparently directed to the charge of conspiracy to pay and receive kickbacks. While the movant may be correct that in an ordinary business paying based on performance is acceptable, the Medicare rules forbid such a practice. See 42 U.S.C. § 1320a-7b(b)(2)(A). Thus any evidence about general business practices would have been irrelevant with regard to the kickbacks paid in this case. Thus, even if such evidence had been presented, the outcome at trial was unlikely to be different and the petitioner cannot establish prejudice.

Pretrial Discovery Tactics

The movant next claims that she was denied a fair trial because the government allegedly engaged in pretrial discovery tactics designed to secretly discover the defense strategy. She points to the proceedings against a co-conspirator, Dr. Salo Shapiro, where she alleges the government process for providing discovery allowed them to "sneak a peak" at what defense counsel was using as evidence to build its case. She contends that the government engaged in similar tactics in her case.

This claim is pure speculation. The movant's claim that the government was able to discern her trial strategy and tactics relies on the fact that government inadvertently received compact discs ("CDs") containing a duplicate of the evidence copied by defense counsel in a case involving a co-conspirator, Salo Shapiro. There is no specific allegation that the same occurred in the instant case.

The government in its response has provided correspondence between it and defense counsel. (CV-DE# 13-4 through 13-7). The correspondence reflects that the copying of discovery material was a cooperative endeavor between the parties. The correspondence further reflects that at least one defense counsel used a personal scanner in reviewing and copying documents for the hundreds of boxes of files. Thus, the movant's claim that the same discovery procedure utilized in the Shapiro case was utilized here is unwarranted.

Even if the same discovery process were utilized, the movant has not identified how she was prejudiced. The movant merely alleges in conclusory fashion that the process of copying exhibits that was allegedly utilized violates due process. There is no

14

allegation of what documents the government may have viewed or how such an alleged viewing may have provided the government an unfair advantage that violated due process. In the absence of any such concrete allegations, the movant's claim is nothing more than conclusory speculation. Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir.1991) ("A petitioner is not entitled to an evidentiary hearing ... when his claims are merely conclusory allegations unsupported by specifics ...." (internal quotations and citations omitted)); Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990) (en banc ) ("The petitioner will not be entitled to an evidentiary hearing when his claims are merely 'conclusory allegations unsupported by specifics' ...." (quoting Blackledge v. Allison, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977))); United States v. Jones, 614 F.2d 80, 82 (5th Cir.1980) ("When claims for habeas relief are based on unsupported generalizations, a hearing is not required." (internal quotations and citations omitted)); Scott v. United States, 598 F.2d 392, 393 (5th Cir.1979) ("Contrary to [the movant's] assertions, ... the right to a hearing is not established simply by filing a petition under 28 U.S.C. § 2255. When claims for habeas relief are based on unsupported generalizations, a hearing is not required."). Thus, the movant having failed to establish either misconduct by the government or prejudice, this claim should be denied.

Presentation of Allegedly False Testimony

The movant next contends that the government knowingly presented false testimony. She alleges that John Jackson's testimony that he learned of improprieties at another clinic through the news was false. This claim is based on the allegation that Jackson testified that he learned of improprieties in June of 2010 when he was terminated from Biscayne Milieu while the news coverage of the other clinic did not occur until the fall of 2010.

15

The movant is essentially presenting a <u>Giglio</u>[1] claim.

The Supreme Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair. <u>Pyle v. Kansas</u>, 317 U.S. 213 (1942).; <u>Alcorta v. Texas</u>, 355 U.S. 28 78 (1957); <u>Napue v. Illinois</u>, 360 U.S. 264 (1959); <u>Miller v. Pate</u>, 386 U.S. 1 (1967); <u>Giglio v. United States</u>, 405 U.S. 150 (1972); <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637 (1974). To be entitled to relief, the government must have knowingly used false evidence and that evidence must have been material. <u>Tejada v. Dugger</u>, 941 F.2d 1551, 1556 (11th Cir.1991) ; <u>Jacobs v. Singletary</u>, 952 F.2d 1282, 1287 n. 3 (11th Cir.1992). "In the absence of a showing that the prosecution knowingly and intentionally used material, perjured testimony to obtain a conviction, appellant is entitled to no post-conviction relief even where testimony is perjured." <u>Elliott v. Beto</u>, 474 F.2d 856 (5th Cir.1973) <u>cert. denied</u>, 411 U.S. 985 (1973), (citing <u>Jackson v. United States</u>,, 384 F.2d 375, 375-376 (5th Cir. 1967). "In order to prevail on a <u>Giglio</u> claim, a petitioner must establish that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." <u>Tompkins v. Moore</u>, 193 F.3d 1327, 1339 (11th Cir.1999). "As far as Giglio materiality is concerned, the clearly established law of the Supreme Court is simply that reversal of a conviction is required when 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" <u>Ventura v. Attorney Gen.</u>, Fla., 419 F.3d 1269, 1279 (11th Cir. 2005)

In the instant case the movant cannot establish either that the prosecutor knowingly presented perjured testimony or that the

---

[1]<u>Giglio v. United States</u>, 405 U.S. 150 (1972).

testimony was material. The complained of testimony was presented during the course of a lengthy direct and cross examination of John Jackson. John Jackson was one of the "case managers" who directed patients to Biscayne Millieu. He was ultimately fired in June of 2010. He testified that he was fired because Antonio Macli did not want to expose Biscayne Millieu to the problems that American Therapeutic, a different PHP, was encountering. Jackson testified that he knew this other PHP was under investigation based on what he had read and seen on the news. However, at the time Jackson was fired there had not yet been any news reports of the problems at American Therapeutic. A review of Jackson's testimony in this regards shows the he volunteered that he was aware of the problems through the news media in response to a question asking "what sort of problems were you aware of that were involving American Therapeutic at the time." Jackson responded, "From what I heard in the newspaper and on TV . . ." (CR-DE# 1150, p. 145). This response was objected to by one of the defense counsel, resulting in a sidebar conference.

At sidebar the government explained that the testimony was relevant to show that Biscayne Millieu was aware of other federal investigations and were taking steps to insulate themselves from prosecution. The court permitted a colloquy outside the presence of the jury where the following occurred:

Prosecutor:   When Antonio Macli told you that these steps had to be taken in response to what was happening at American Therapeutic, what did you understand him to be referring to?

Jackson:   Meaning that I could not be paying patients for the treatment of services.

Prosecutor:   What did you understand him to be referring to when he discussed American

                              Therapeutic?

          Jackson:           That the facility could be under
                             investigation and we could go to jail.

The court asked its own questions of Jackson as follows:

          Court:             Did Antonio Macli ever say anything more
                             other than mentioning the name American
                             Therapeutic?

          Jackson:           That is all. He just said we could not do
                             this you know, anymore, and he said, JJ,
                             I have to let you go.

          Court:             Did he say, I have read about American
                             Therapeutic, or you just had read about
                             American Therapeutic?

          Jackson:           No, we had talked about American
                             Therapeutic. He said you know American
                             Therapeutic right now is under a lot of -
                             you know, they are having a lot of
                             problems and I understood that from what
                             I had read in the newspaper and what I
                             saw on TV.

          Court:             That?

          Jackson:           That they were under investigation.

          Court:             And they are another PHP?

          Jackson:           Yes, sir.

          Court:             So Mr. Antonio Macli acknowledged to you
                             that he was aware that American
                             Therapeutic was under some kind of
                             investigation?

          Jackson:           Yes, sir.

The court found that the prosecutor could ask Jackson in a similar
manner before the jury. After the sidebar, the prosecutor continued
his questioning of Jackson as follows:

                                    18

Prosecutor:      Going back to the discussion that you had
                 with Antonio Macli in which he mentioned
                 American    Therapeutic,    from    that
                 discussion,   did   you   have   the
                 understanding that American Therapeutic
                 was under investigation?

Jackson:         Yes, sir, based on what I had read and
                 saw on TV.

Later, Jackson testified that he had a number of conversations with
Antonio Macli in which they discussed that Jackson had been paying
patients to attend Biscayne Millieu. (CR-DE# 1150, p. 155).

    The allegedly perjured testimony was not elicited by the
government. The prosecutor asked Jackson if understood from Antonio
that American Therapeutic was under investigation. Rather than
simply yes, Jackson also interjected that he had heard about
American Therapeutic in the news. Jackson's testimony about
learning that American Therapeutic through news media was not
responsive to the government's questioning as his answer exceeded
the scope of the question asked and was not elicited by the
government.

    It must be remembered that the trial occurred in 2011 and the
events about which Jackson testified occurred in June 2010. Both
parties have acknowledged that during the intervening time there
were news reports of the investigation and prosecution of American
Therapeutic.[2] It is reasonably likely that rather than perjury,
Jackson's testimony reflected his memory of his conversation with
Antonio Macli and his memory of reading of American Therapeutic in
news reports. In any event the gist of the testimony was that
Antonio Macli had discussed problems at American Therapeutic as a

---

[2]The government has attached a copy of a Miami Herald report published on
October 21, 2010 announcing the arrests in the American Therapeutic case.

reason why he had to let Jackson go.[3] The mistaken testimony about the timing of the news reports was not material.

As noted above, false testimony warrants reversal of a conviction only if there is a reasonable likelihood that it affected the judgment of the jury. Here, there has been no such showing. Jackson's testimony spans over 700 pages of transcripts. In total the trial spans over 25 volumes of transcripts and was conducted over 19 days. There was no further mention of Jackson's testimony about learning of the American Therapeutic investigation from the news media or that the investigation of American Therapeutic precipitated Jackson's firing. Rather, during closing argument the government referred to a document that indicated that the movant, her brother and father were aware of the FBI investigation prior to the firing of Jackson. The government argued that Jackson, and other recruiters, were fired in an attempt to conceal that the movant and her family were aware of the kickbacks being paid by those recruiters. In short, there was sufficient other evidence to support the government's argument in this regard. There is no reasonable likelihood that Jackson's testimony affected the judgment of the jury. This claim should be denied.

Constitutionality of Federal Fraud Statutes

The movant next claims that the federal fraud is unconstitutionally vague. She argues that the legislative decision to allow the courts to define "scheme to defraud" constitutes a violation of the separation of powers doctrine in that it delegates

---

[3]The government notes that there was a civil action against American Therapeutic involving similar medicare fraud claims that had been pending since 2007 in case number 04-20255-CV-COHN. The civil complaint in that case was unsealed on September 26, 2007. The government contends that it is not unreasonable to assume the civil action against another PHP was known to others in the industry.

legislative authority to the courts. She argues that allowing creation of legal duties by the court "transgresses the Constitution's prohibitions against bills of attainder and *ex post facto* laws.

The movant's claim is procedurally barred as it was not raised on direct appeal. Nothing prohibited the movant's challenge to the constitutionality of the health care fraud statute on direct appeal. The movant has provided no argument explaining the cause for failing to raise this claim on direct appeal. In the absence of the showing of both cause and prejudice, a claim, including a constitutional claim, that could have been raised on direct appeal is barred from presentation in a § 2255 motion proceeding. See Lynn v. United States, 365 F.3d 1225, 1234 (11th Cir. 2004) ("Under the procedural default rule, a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding.").

Assistance During Plea Bargaining Negotiations

The movant contends that counsel failed to properly explain the breadth and scope of federal fraud laws. She argues that if she had understood a person could be found guilty of a crime essentially for assisting a person who was thinking about deceptive conduct, then she would have either attempted to enter into an unwired plea agreement or pleaded guilty to the indictment which would have permitted a reduction her sentence for acceptance of responsibility and a minor role reduction. She believes her sentence would have been less than 60 months.

Claims of ineffective assistance of counsel during the plea

negotiations are reviewed under the <u>Strickland</u> test. The movant must establish both counsel's deficient performance as well as prejudice. <u>See</u> <u>Missouri v Frye</u>, 566 U.S. 134, 140 (2012). Where a defendant rejects a plea offer, she must show that but for counsel's deficient performance she would have accepted the offer and that the plea would have resulted in a lesser sentence. <u>Gissender v. Seaboldt</u>, 735 F.3d 1311, 1317 (11th Cir. 2013). A defendant's denial of guilt is relevant to consideration of whether she would have accepted a plea offer. <u>See</u> <u>Osley v. United States</u>, 751 F.3d 1214, 1224 ("[Defendant]'s claim that he would have pled guilty had he been properly informed is also undermined by his repeated claims of innocence.").

Here the movant contends that "[i]f counsel had explained that a person could be found guilty of a crime essentially for assisting a person who was thinking about deceptive conduct, then [she] would have either attempted to enter into an unwired plea agreement or pleaded guilty to the indictment, which would have permitted a 5 level reduction in sentence for acceptance of responsibility and minor role." She further contends that if she had known of the true nature of the elements of her crimes she would have prevailed upon her father to agree to the wired deal. She alleges with no elucidation that a plea agreement would have resulted in a sentence of less than 60 months.

The movant claims that counsel should have advised her that "a person could be found guilty of a crime essentially for assisting a person who was thinking about deceptive conduct." However, if counsel had so advised the movant, such advice would have been wrong. As recognized by the Eleventh Circuit, in order to violate the health care fraud statute, "the defendant must be shown to have known that the claims submitted were, in fact, false." <u>United</u>

22

States v. Medina, 485 F.3d 1291, 1297 (11th Cir. 2007). Further, to prove knowing and voluntary participation, the government is required to prove beyond a reasonable doubt that the movant had a specific intent to join the conspiracy. United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997).

If the movant had entered a guilty plea based on such erroneous advice she might be able to claim that counsel was ineffective for providing such advice. That is not the case here. The movant has provided no detail regarding her conversations with counsel regarding his advice about the guilty plea. She merely alleges that counsel failed to give her incorrect advise. Thus she has failed to establish that counsel's performance was deficient and cannot meet the first prong of the Strickland test.

Furthermore, the movant has not established prejudice. The movant supposes, with no supporting argument, that by pleading guilty she would have been sentenced to less than sixty months. This allegation is nothing more than speculation. If the movant had entered a guilty plea to the indictment it is highly unlikely that she would have been sentenced to less than sixty months. Her sentence following trial was 262 months. Even assuming a three level reduction for acceptance of responsibility, the movant's sentencing guidelines would have been between 188 and 234 months. See USSG Sentencing Table. Her claim that she would have received an additional 2 level minor role reduction is also misplaced as she actually was subject to a three level upward adjustment because she was a manager or supervisor. Since the movant's allegation that she would have been sentenced to less than 60 months is completely baseless, her allegation that she would have pleaded guilty to such a sentence is without merit. The movant, in addition to failing to establish deficient performance, cannot establish that she was

23

prejudiced. This claim should be denied.

Failure to Object to Jury Instruction

In her final claim the movant contends that counsel was ineffective for failing to object that the jury instructions did not define either attempt or scheme to defraud. She argues that the court did not specify that defraud requires more than deception, that it has to be deception designed to harm someone. She alleges that the government paid for services rendered. According to the movant, if the jury had been properly instructed it would have found her business tactics distasteful, but not illegal.

The jury was instructed regarding the scheme to defraud that:

The Defendant can be found guilty of this offense only if all the following facts are proved beyond a reasonable doubt:

(1)  the Defendant knowingly executed, or attempted to execute, a scheme or artifice to defraud a health-care benefit program, or to obtain money or property owned by, or under the custody and control of, a health-care benefit program by means of false or fraudulent pretenses, representation, or promises;

(2)  the false or fraudulent pretenses, representations, or promises related to a material fact;

(3)  the Defendant acted willfully and intended to defraud; and

(4)  the Defendant did so in connection with the delivery of or payment for health-care benefits, items, or services.

"Health-care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract. **The parties have stipulated that Medicare is a "health-care benefit program."**

A "scheme to defraud" includes any plan or course of

24

action intended to deceive or cheat someone out of money or property by using false or fraudulent pretenses, representations, or promises relating to a material fact.

A statement or representation is "false" or "fraudulent" if it is about a material fact that the speaker knows is untrue or makes with reckless indifference as to the truth and makes with intent to defraud. A statement or representation may be "false" or "fraudulent" when it's a half truth or effectively conceals a material fact and is made with the intent to defraud.

A "material fact" is an important fact that a reasonable person would use to decide whether to do or not do something. A fact is "material" if it has the capacity or natural tendency to influence a person's decision. It doesn't matter whether the decision-maker actually relied on the statement or knew or should have known that the statement was false.

To act with "intent to defraud" means to do something with the specific intent to deceive or cheat someone, usually for personal financial gain or to cause financial loss to someone else.

(CR-DE# 836, p. 7-8). These instructions tracked the Eleventh Circuit's pattern jury instructions for health care fraud. See Eleventh Circuit Pattern Jury Instructions Offense Instruction 53 (2010). The movant has provided no legal citation indicating that these instructions were subject to objection.

The movant argues that the instruction did not specify that defraud means more than deception. She alleges that the deception must be designed to harm someone. These instructions provided exactly what the movant argues they should have. As related above, "to act with 'intent to defraud' means to do something with the specific intent to deceive or cheat someone" for personal financial gains or to cause financial loss. Thus, in order to be convicted the government had to prove that the movant acted with the specific intent to deceive or cheat someone for financial gain. Since any

objection to the instructions would have been meritless, counsel cannot be found ineffective for failing to object. See Chandler v. Moore, 240 F.3d 907, 917 (11th Cir.2001) (declaring that defendant's appellate counsel was not ineffective for failing to raise a nonmeritorious issue). This claim should be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2255 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2255 Cases.

The petitioner in this case fails to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542 (2000) (explaining the meaning of this term) (citation omitted). Therefore, it is recommended that the Court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing Section 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

## Conclusion

It is therefore recommended that this motion to vacate sentence be denied and the case closed.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Signed this 5th day of March, 2018.

_____
UNITED STATES MAGISTRATE JUDGE

cc:
Sandra Huarte
97267-004
Coleman Low
Federal Correctional Institution
Inmate Mail/Parcels
Post Office Box 1031
Coleman, FL 33521
PRO SE

Michael Scott Davis
United States Attorney's Office
99 NE 4 Street
Miami, FL 33132